UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: HON. LISA W. WANG, JUDGE

| | | |
|---|---|---|
| GREENINGTON LLC,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant. | ) | Court No.: 23-00243 |

**DEFENDANT'S REPLY BRIEF IN FURTHER SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT**

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

MARCELLA POWELL
Senior Trial Counsel
Civil Division, U.S. Dept. of Justice
Commercial Litigation Branch
26 Federal Plaza, Room 346
New York, New York 10278
Tel. (212) 264-9230 or 9236
Attorneys for Defendant

Of Counsel:
Michael Anderson
Office of the Assistant Chief Counsel
International Trade Litigation
U.S. Customs and Border Protection

Dated: September 18, 2026

**TABLE OF CONTENTS**


SUMMARY OF THE ARGUMENT .......... 1

ARGUMENT .......... 2

I. THE GOVERNMENT PROPERLY CONSTRUED THE SUBJECT EXCLUSION .......... 3

A. The Government Interprets The Terms USTR Actually Used In The Exclusion .......... 3

B. CBP's Review Of HFRG's Exclusion Request Was Proper .......... 5

C. Greenington's Invocation Of The Cannon Of *In Pari Materia* Is Erroneous .......... 7

II. GREENINGTON'S INTERPRETATION OF THE SUBJECT EXCLUSION IS VAGUE AND UNADMINISTERABLE .......... 12

A. Greenington's Interpretation Of The Subject Exclusion Fails Because It Is Incomplete And Vague .......... 12

III. Greenington's Experts' Reports And Testimony Should Be Disregarded .......... 13

CONCLUSION .......... 17

# TABLE OF AUTHORITIES

## Cases

*Amcor Flexibles Singen GMBH v. United S*tates,
425 F. Supp. 3d 1287 (Ct. Int'l Trade 2020) .......................................................... 9, 10

*Brookside Veneers, Ltd. v. United States,*
847 F.2d 786 (Fed. Cir. 1988) .......................................................................... 2

*Kahrs Int'l, Inc. v. United States*, 791 F. Supp. 2d 1228 (Ct. Int'l Trade 2011)………………...14

*Libbey Glass, Div. of Owens-Illinois, Inc. v. United States*,
921 F.2d 1263 (Fed. Cir. 1990) ........................................................................ 7

*Logitech, Inc. v. United States*,
532 F. Supp. 3d 1358 (Ct. Int'l Trade 2002) .......................................................... 2

*Marubeni Am. Corp. v. United States,*
35 F.3d 530 (Fed. Cir. 1994) .......................................................................... 2

*Molenda v. Hoechst Celanese Corp*., 60 F. Supp. 2d 1294 (S.D. Fla. 1999)……………………13

*Plexus Corp. v. United States*,
489 F. Supp. 3d 1379 (Ct. Int'l Trade 2020) .......................................................... 2

*RVM Consultants, Inc. v. Centro De Gestion Unica Del Suroeste*, 491 F. Supp. 2d 245 (D. Puerto Rico 2007)…………………………………………………………….……………………13

*Samsung Int'l., Inc. v. United States*, 887 F. Supp. 2d 1330 (Ct. Int'l Trade 2012)……………..14

## HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES

### Chapter 39

Heading 3920.................................................................................................. 10

Heading 3921.................................................................................................. 10

### Chapter 44

Heading 4112.................................................................................................. 9

Heading 4410.................................................................................................. 6, 7, 8, 10

Subheading 4410.1.0020 ........ 8

Subheading 4410.11.0030 ........ 8

Subheading 4410.19.0020 ........ 8

Subheading 4410.19.0030 ........ 8

Heading 4411 ........ 9

Heading 4412 ........ 6, 7, 8, 9, 10.

Subheading 4412.10 ........ 9

Chapter 44, Note 1(o) ........ 8

Chapter 44, Note 1(c) ........ 9

**Chapter 94**

Heading 9401 ........ 6, 7, 8, 10

Subheading 9401.80.20 ........ 8

Heading 9403 ........ 6, 7, 10

**Rules**

USCIT Rule 30(b)(6) ........ 4, 5, 11

**Other Authorities**

*Laminated,*
Dictionary.com, https://www.dictionary.com/browse/laminated ........ 4

*In Pari Materia,*
Merriam Webster, https://www.merriam-webster.com/legal/in%20pari%20materia ........ 7

## SUMMARY OF THE ARGUMENT

The question presented by the parties' cross-motions for summary judgment is the proper interpretation of the Section 301 exclusion for "household furniture of high-pressure laminated bamboo." The parties have proffered two fundamentally different interpretations of the exclusion. When properly construed, the exclusion covers household furniture of bamboo that has a high-pressure laminate surface. The Government's interpretation is the only one that is grounded in general, technical and scientific dictionaries, and industry standards. It is a complete interpretation in that it gives meaning to every word of the exclusion and does not render any surplusage. The interpretation also reflects commercial reality. Indeed, household furniture with a high-pressure laminate surface is a known, identifiable category of goods in commerce. The imported furniture at issue is not made of bamboo that has a surface of high-pressure laminate and, therefore, those goods are not covered by the exclusion.

Greenington argues that the subject exclusion covers household furniture of bamboo laminated under high pressure. Greenington's manufacturing-based interpretation does not hold. It relies solely on stringing adjectives together which results in an impermissibly vague interpretation. Greenington's interpretation is not grounded in any authority explaining what "high pressure laminated" means in the context of laminating bamboo, such as what exact PSI constitutes "high pressure." Without specific PSI and other benchmarks, Greenington's interpretation is not administrable. But yet it makes no attempt to fill those gaps with authoritative sources. Greenington's interpretation fails, and the Government's motion for summary judgment should be granted.

# ARGUMENT

## I. THE GOVERNMENT PROPERLY CONSTRUED THE SUBJECT EXCLUSION.

### A. The Government Interprets The Terms USTR Actually Used In The Exclusion.

In our initial brief, we established that the common and commercial meaning of the exclusion language "household furniture of high-pressure laminated bamboo" describes a category of furniture that is not defined in the HTSUS, or in any section or chapter note. Therefore, we consulted lexicographic and scientific authorities, dictionaries, and reliable industry sources. *Brookside Veneers, Ltd. v. United States,* 847 F.2d 786, 789 (Fed. Cir. 1988). *See also Marubeni Am. Corp. v. United States,* 35 F.3d 530, 534 (Fed. Cir. 1994).

The term "high-pressure laminate" is defined as "[a] plastic-substrate laminate molded and cured at pressures of, commonly, 1200-2000psi (8–14 x $10^6$ newtons per square meter)." *See The McGraw-Hill Dictionary of Scientific and Technical Terms* (6 ed. 2006).[1] Ex. 3. "High-pressure laminate" is also defined as "[l]aminates molded and cured at pressures not lower than 1,000 per sq. in. (70 kg per sq cm) and more commonly in the range of 1,200 to 2,000 lb per sq in. (84 to 140 kg per sq cm)." *Dictionary of Architecture and Construction*. (4th 3d. 2006). Ex. 4. The International Standards Organization (ISO) defines "high-pressure laminate" as a "sheet consisting of layers of cellulosic fibrous material (normally paper) impregnated with thermosetting resins and bonded together by the high-pressure process (3.2)." ISO 4586-1:2018.

---

[1] This Court has relied on definitions from the *The McGraw-Hill Dictionary of Scientific and Technical Terms. See, e.g., Logitech, Inc. v. United States*, 532 F. Supp. 3d 1358, 1367 (Ct. Int'l Trade 2002); *Plexus Corp. v. United States*, 489 F. Supp. 3d 1379, 1397 (Ct. Int'l Trade 2020).

Finally, the Composite Technology Association defines "high-pressure laminate" in the following fashion:

> [High-pressure laminate] is produced by saturating multiple layers of kraft paper with phenolic resin. A layer of printed décor paper is placed on top of the kraft paper before pressing. The resulting sandwich is fused together under heat and pressure (more than 1,000 PSI). Because phenolic and melamine resins are thermoset plastics, the curing process transforms the resin into plastic by a cross linking process that converts the paper sheets into a single, rigid laminated sheet. Thermo-setting creates strong, irreversible bonds that contribute to [high-pressure laminate]'s durability.

*See* https://www.compositepanel.org/products/decorative-surfaces/high-pressure-laminates/.

We then established that the foregoing definitions make clear that high-pressure laminate is a surface material. Accordingly, the exclusion language "household furniture of high-pressure laminated bamboo" describes bamboo furniture incorporating a high-pressure laminate surface. Because Greenington's furniture does not incorporate a high-pressure laminated surface, it is not covered by the Section 301 exclusion.

As an initial matter, Greenington does not dispute any of our definitions of "high-pressure laminate." Rather, Greenington continues to argue that the Government's interpretation of the subject exclusion improperly reads the words "high-pressure laminate" and "surface" into the exclusion. Pl.'s Opp. at 12. This argument still fails as Greenington misunderstands statutory interpretation and disregards the purpose of a Section 301 exclusion and USTR's exclusion framework.

The term "high-pressure laminate" is not additional language. It is the exclusion's own term posited as "laminated," which is the past participle of "laminate." The term "laminated," as used in the exclusion, describes a present physical characteristic of the bamboo furniture, *i.e.*, it is laminated, and not a manufacturing process. Moreover, the term "surface" is also not

additional language. The term "laminate," when used as a past participle, inherently refers to a bonded surface layer. *See* "laminated" "2. covered with a thin protective layer of plastic or synthetic resin" and "3. "another word for laminate." Dictionary.com, https://www.dictionary.com/browse/laminated (last visited Sept. 16, 2026). Thus, reading "household furniture of high-pressure laminated bamboo" to mean household furniture made of bamboo having a surface of high-pressure laminate does not read new words into the exclusion. It interprets the language of the exclusion pursuant to its ordinary common and commercial meaning.

Based on the plain language of the subject exclusion, the dictionary and technical definitions and USTR's exclusion framework, the correct interpretation of the subject exclusion turns on what a product is, not how it was made. The term "laminate" denotes a surface covering and is indicative of the physical characteristics of the product. Conversely, "laminated" denotes a manufacturing process and is indicative of how the product is made. Thus, household furniture of bamboo with a high-pressure laminate surface is the category of goods covered by the exclusion.

**B. CBP's Review Of HFRG's Exclusion Request Was Proper.**

Notwithstanding the fact that CBP has expressly detailed how it arrived at its interpretation of the subject exclusion in its response to plaintiff's interrogatories, during the USCIT Rule 30(b)(6) deposition of its designated representative, and in its initial moving brief, Greenington continues to press its argument that CBP was not permitted to review HFRG's exclusion request in connection with interpreting the subject exclusion. Specifically, Greenington argues that the Government's "entire" statutory interpretation argument revolves around HFRG's exclusion request and that CBP used the exclusion request to displace the

product description in the actual exclusion. Pl.'s Opp. at 4. Greenington's argument is without merit.

Moreover, it is well-settled that statutes cannot be interpreted in a way that leads to absurd results. *Pitsker v. Off. of Pers. Mgmt.*, 234 F.3d 1378, 1384 (Fed. Cir. 2000). Therefore, it was prudent for CBP to confirm that its interpretation of the exclusion is consistent with commercial reality. That is, there exists in the commercial space household furniture that is made of bamboo that has a high-pressure laminated surface. CBP properly reviewed HFRG's exclusion request but derived its interpretation of the subject exclusion from the product description, general and technical definitions, and industry standards. Indeed, CBP's USCIT Rule 30(b)(6) designated witness, Thomas Dougherty, testified that the exclusion request does not carry any weight.

> Q. I must have used a bad highlighter when I highlighted this. So -- now, we mentioned that Home Furnishings Resource Group -- I'll call them HFRG -- requested the exclusion.· Did you review the exclusion request in preparation for this the deposition?
>
> A.· I might have looked at it once. ·
>
> Q.· Is it a source that CBP relied on? ·
>
> A.· Not to my knowledge, because the exclusion request is not the exclusion.
>
> Q.· Right. But you see under Interrogatory Number 1, the actual question.· It says:· "Please describe in detail your basis for determining that the subject products do not meet the terms and conditions for the subject exclusion"?
>
> A.· I believe -- so NIS Seth Mazze did discuss HFRGC's products with them when he wrote the -- when he wrote the QUICS alert.· So I know he did speak with ·them and he might have gotten their understanding of what the exclusion was, but in relying on -- we -- you know, the exclusion request is an exclusion request. It doesn't necessarily carry

weight.

Ex. 7, Deposition Transcript of Thomas Dougherty (Dougherty Tr.) at 76:5-17. CBP's review of the exclusion request and its communication with HFRG was reasonable and appropriate. Nothing prohibits CBP from consulting that information. However, the governing standard for interpreting the scope of an exclusion is the product description set forth in the exclusion itself. *See*, *e.g.*, Notice of Product Exclusion Extensions: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation, 85 FR 48600 (August 11, 2020) ("the scope of each exclusion is governed by the scope of the ten-digit HTSUS headings and product description in [the USTR's notices], and not by the product descriptions set out in any particular request for exclusion"). CBP has established that when the product description is properly construed, it does not cover Greenington's imported furniture.

Finally, Greenington argues that *Keystone Automotive Operations, Inc. v. United States*, 732 F. Supp. 3d 1339 (Ct. Int'l 2024) is distinguishable because in that case, there was no record of industry use of the term utilized in the exclusion language, whereas, in this action, there is record evidence that "laminated bamboo" refers to a specific product in commerce. Pl.'s Opp. at 6. Greenington's argument is unpersuasive. The *Keystone* Court "observed" the exclusion request to educate itself as to the genesis of the exclusion at issue and the products at issue in that request. *Keystone*, 732 F. Supp. 3d at 1350 ("Rather than using the phrase "side armor" or another term for Polaris' products, however, USTR included the term "side protective attachments" in U.S. Note 20(iii) to cover Polaris' "side armor" products"). CBP's reference to HFRG's exclusion request is no different. Like the *Keystone* Court, CBP reviewed the exclusion request to educate itself, and not to narrow or displace the product description in the actual exclusion.

### C. Greenington's Invocation Of The Cannon Of *In Pari Materia* Is Erroneous.

Relying on the cannon of statutory interpretation *in pari materia*, Greenington next argues that the terms "laminate," "laminated," and "surface covered" have a consistent meaning across several tariff provisions of the HTSUS. Specifically, Greenington argues that the term "laminate" has the same meaning across headings 9401, 9403, 4410, and 4412, HTSUS, and, thus that this meaning also governs the term "laminated" in the subject exclusion. Pl.'s Opp. Br. at 15. According to Greenington, those headings should be read together to elucidate the meaning of the term "high-pressure laminated" in the exclusion. Greenington's *in pari materia* argument is not supported by the law or the tariff code, itself.

The canon of statutory construction *in pari materia* means "on the same subject or matter**:** in a similar case." *See* Merriam Webster, https://www.merriam-webster.com/legal/in%20pari%20materia (last visited on Sept. 16, 2026). The canon instructs that statutes that relate to the same subject matter, or share the same purpose or object, are considered *in pari materia* and must be interpreted together. Ruth F. Sturm, Customs Law and Administration, § 51.6, at 59 (3d ed. 1992). But "the presumption [of identical meaning] readily yields to the controlling force of the circumstance that the words, though in the same act, are found in such dissimilar connections as to warrant the conclusion that they were employed in the different parts of the act with different intent." *Libbey Glass, Div. of Owens-Illinois, Inc. v. United States*, 921 F.2d 1263, 1265 (Fed. Cir. 1990).

Greenington's cherry-picked selection of headings 4410, 4412, 9401, and 9403, HTSUS, is predicated on nothing more than the appearance of the word "laminated" somewhere in their text. Indeed, Greenington treats "laminated," and even "laminated bamboo," as if those terms were the only terms in the subject exclusion. They are not. The exclusion covers "household

furniture of high-pressure laminated bamboo," and none of the four tariff headings Greenington cites contains that phrase.

Furthermore, the cannon of *in pari materia* is not based on whether statutory provisions share the same word, it is based on whether they share the same subject matter. Greenington never establishes that the four headings that it cites address the same subject matter as the exclusion, just that they use the same word. Moreover, even though those headings have subheadings that contain the word "laminated," headings 9401, 9403, 4410, and 4412, HTSUS, are not *in pari materia* with the exclusion at issue.

Heading 4410, HTSUS, covers:

> Particle board, oriented strand board (OSB) and similar board (for example, waferboard) of wood or other ligneous materials, whether or not agglomerated with resins or other organic binding substances:

Heading 4412, HTSUS, covers "[P]lywood veneered panels and similar laminated wood[.]" Both headings 4410 and 4412, HTSUS, cover wood-related articles, whereas the exclusion covers "household furniture of high-pressure laminated *bamboo*." Those headings cover different subject matter, and there is no indication that they are to be read together with the exclusion. Indeed, Chapter 44, Note 1(o) makes clear that furniture ("Articles of chapter 94") is expressly excluded from Chapter 44. This confirms that those headings should not be read together with the exclusion.

Heading 9401, HTSUS, is also not *in pari materia* with the exclusion at issue. Greenington's argument with respect to that heading rests on subheading 9401.80.20, HTSUS, which covers "[s]eats (other than those of heading 9402), whether or not convertible into beds, and parts thereof: other seats: of reinforced or laminated plastics." Pl.'s Opp. at 15-16. That subheading identifies a category of materials for seats, and does not refer to bamboo. A single

subheading describing a plastic seating material does not establish the meaning of "laminated" for purposes of the entire HTSUS or the subject exclusion.

Greenington further argues that because subheadings 4410.11.0020 and 4410.19.0020, HTSUS, describe particle board surface covered with melamine-impregnated paper as "surface-covered," and subheadings 4410.11.0030 and 4410.19.0030, HTSUS, describe board surface covered with plastic decorative laminates in the same manner, Greenington speculates that the HTSUS would have described high pressure laminate surfaced furniture as "household furniture of bamboo that is surface-covered with a high-pressure laminate." Pl.'s Opp. at 16. Greenington is incorrect. Subheadings 4410.11.0020 and 4410.19.0020, HTSUS, use the phrase "surface covered" because Additional U.S. Note 1(c) to Chapter 44 defines that term for purposes of headings 4411 and 4412 as an exterior surface treated with fillers, stains, or overlaid with paper, fabric, plastics, or similar material.[2] A statutory definition that is expressly confined to one chapter of the HTSUS cannot become a definition for the entire HTSUS. Chapter 94, where the furniture at issue is classified, does not contain a comparable note, and there is no basis to read that note into Chapter 94.

Greenington next points to the use of "laminated bamboo" in subheading 4412.10, HTSUS, and argues that this usage confirms that "laminated" describes a material built by bonding layers together, and not a substrate covered by a separately applied laminate. Heading 4412, HTSUS, covers "plywood, veneered panels and similar laminated wood," meaning unfinished board and panel products, not finished furniture. That heading 4112, HTSUS, uses

[2] Additional U.S. Note 1(c) to Chapter 44, HTSUS, provides that "[t]he term 'surface covered,' as applied to the articles of headings 4411 and 4412, means that one or more exterior surfaces of a product have been treated with creosote or other wood preservatives, or with fillers, sealers, waxes, oils, stains, varnishes, paints or enamels, or have been overlaid with paper, fabric, plastics, base metal, or other material."

"laminated" to describe how a wood panel is built is unremarkable. The heading has no bearing on how the term "laminated" operates in a Section 301 exclusion describing finished household furniture, an entirely different class of merchandise.

Greenington's reliance on *Amcor Flexibles Singen GMBH v. United S*tates, 425 F. Supp. 3d 1287 (Ct. Int'l Trade 2020) as support for its invocation of the cannon *in pari materia* is misplaced. In that case, the classification question was whether imported multilaminate flexible packing materials, which consisted "of multiple layers of plastics combined with a single layer of aluminum foil sandwiched in between the plastic layers," were classifiable in heading 3921, HTSUS, which covers "[o]ther plates, sheets, film, foil, strip, of plastics." 425 F. Supp. 3d at 1292, 1302. That heading does not explicitly mention plastics combined with other materials. However, the prior heading, heading 3920, HTSUS, covers "[o]ther plates, sheets, film, foil, and strip, of plastics, *non-cellular and not reinforced, laminated, supported or similarly combined with other materials*." (emphasis added). The Court determined that reading the provisions together "support[ed] the conclusion that Heading 3921 covers aluminum foil with plastic. . . . because while heading 3920 covers plastics 'not reinforced, laminated, supported or similarly combined with other materials,' Heading 3921 is intended to cover 'other' plastic goods excluded from 3920, *e.g.*, plastics laminated with aluminum foil." *Id.* at 1296–97, 1301–02. The Court invoked the cannon of *in pari materia* to support its reading of headings 3920 and 3921, HTSUS, together. *Id.* at 1301–02. Both tariff provisions are textually similar, they are contained in the same HTSUS chapter, and encompass the same class of goods (plates, sheets, film, foil, and stip). Those shared features are what made the cannon of *in pari materia* the appropriate tool for interpreting heading 3921, HTSUS.

Unlike the Court's analysis in *Amcor*, Greenington argues that four tariff headings, headings 9401, 9403, 4410, and 4412, which are not textually similar and cover entirely different classes of goods, should be read together. Greenington's invocation of the cannon of *in pari materia* is simply incorrect.

## II. GREENINGTON'S INTERPRETATION OF THE SUBJECT EXCLUSION IS VAGUE AND UNADMINISTERABLE.

### A. Greenington's Interpretation Of The Subject Exclusion Fails Because It Is Incomplete And Vague.

Greenington argues that "high-pressure laminated bamboo" is bamboo that is laminated under high pressure. That is a manufacturing-based interpretation. In our moving brief, we established that Greenington's interpretation is not administrable because it is imprecise and vague. Greenington has not provided any authority to explain what "high pressure" actually means in the context of laminating bamboo. For instance, what are the trade or industry standards for "high pressure"? How is the pressure measured? Is a specific press required? Despite these significant gaps in its interpretation of the subject exclusion, Greenington has made no efforts to close them with sound, reliable authority.

In an effort to salvage its faulty interpretation, Greenington relies on the pressure criteria from the Government's definitions of "high pressure laminate" -- definitions that Greenington flatly rejected and argued that they are not relevant to the interpretation of the subject exclusion. Pl.'s Opp. at 25. Greenington cannot have it both ways. Those definitions cannot save Greenington's faulty interpretation of the exclusion as they are limited to the commercial product "high pressure laminate."

Furthermore, Greenington has not provided any evidence of the actual pressure used to manufacture the furniture at issue. Greenington attempts to patch together the missing proof by

arguing that a hydraulic press "is a machine in which great force with slow motion is communicated to a larger plunger by means of liquid force into the cylinder in which it moves by a piston pump of small diameter to which the power is supplied." Pl.'s Opp. at 29. Greenington next claims that "the hydraulic press applies horizontal pressure of 1305 PSI and vertical pressure of 1740 PSI to 2030 PSI . . ." (Pl.'s Opp. at 29). But Greenington does not cite a single source to support its statement. Moreover, Greenington's USCIT Rule 30(b)(6) designated representative, Mr. Yan Lin, testified that he has no personal knowledge of the amount of pressure used to manufacture the bamboo.

> Q. In terms of these figures regarding the horizontal direction pressure and the pressure for the vertical direction, where are these numbers -- what are the source of these numbers?
>
> A. That's from the factory, yeah, sent to us when they doing make the products and what kind of pressure they use.
>
> Q. Is this from – are those figures from both companies that provide products or just one?
>
> A. Pretty much, yes, both company.
>
> Q. One more question about the figures, were they provided to Greenington in a document or – in a document?
>
> A. No.
>
> Q. How were they provided to Greenington?
>
> A. *Oh, I just ask them how many pressure they use. They just told me.*
>
> Q. When did you ask?
>
> A. What?
>
> Q. When did you ask?
>
> A. You know, when I went to the factory to look at the operation, I will ask, okay, how long stay there, how many pressure. So that's kind of knowledge I got from these guys.

*See* Ex. 8, Transcript of the Deposition of Yang Lin (Lin Dep. Tr.) at 27:22-28:20. (emphasis added). Mr. Lin's statement is double hearsay that cannot be considered on summary judgment. *Molenda v. Hoechst Celanese Corp*., 60 F. Supp. 2d 1294, 1303, (S.D. Fla. 1999) (statement of one witness of what another person said they were told constitutes double hearsay that cannot be considered on summary judgment); *RVM Consultants, Inc. v. Centro De Gestion Unica Del Suroeste*, 491 F. Supp. 2d 245, 254 (D. Puerto Rico 2007). Greenington has not proffered any proper documentary proof establishing the pressure applied during the manufacturing process or a witness with personal knowledge of the facts relating to that pressure. Thus, even if Greenington's interpretation of the subject exclusion is correct (which it is not), Mr. Lin's lack of personal knowledge of the pressure involved in manufacturing the furniture at issue is fatal to Greenington's claim.

## III. GREENINGTON'S EXPERTS' REPORTS AND TESTIMONY SHOULD BE DISREGARDED.

The testimony of expert witnesses pertaining to common meaning are advisory and non-binding, and the Court will credit such testimony only to the extent that it is supported, and not contradicted, by reliable textual sources which includes general purpose dictionaries. *Samsung Int'l., Inc. v. United States*, 887 F. Supp. 2d 1330, 1344 (Ct. Int'l Trade 2012); *Kahrs Int'l, Inc. v. United States*, 791 F. Supp. 2d 1228, 1240 (Ct. Int'l Trade 2011). Here, for several reasons, Greenington's experts' affidavits, testimony, and opinions should be given no weight.[3]

[3] The Government reserves the right to move *in limine* to preclude plaintiff's experts. Additionally, contrary to Greenington's assertions, unsworn expert reports are hearsay that cannot be considered on summary judgment. *Monica E. Gonzalez-Lopez v. Municipality of San Juan*, 2026 WL 2690051, at *5 (D.P.R. Sept. 14, 2026) (" . . .an unsworn expert report is inadmissible testimonial evidence that cannot be considered at the summary judgment stage"); *McKnight v. 65 Dune Road LLC*, 2026 WL 2620331, at *20 (E.D.N.Y. Sept. 4, 2026). Greenington appears to have seemingly cured that defect by submitting affidavits.

During his deposition, Dr. Kent Wheiler testified at length regarding the conclusions in his report. His testimony regarding the meaning of "high-pressure laminated bamboo" cannot be reconciled with actual language of the exclusion. Every word in a statute must be given effect, yet Dr. Wheiler testified that <u>all</u> laminated bamboo is made with high pressure, rendering the term "high-pressure" in the exclusion surplusage. Dr. Wheiler explained:

> Q. Is it -- so my question is not "laminated bamboo."· My question is the entire term, "high pressure laminated bamboo." Let me make sure my question is clearer. The term "high pressure laminated bamboo" has four words.· Have you seen that term all together outside of this case?
>
> A. It's not common.· I wouldn't say I haven't seen it, but it's not common because "high pressures" would be considered an unnecessary adjective because in order to laminate bamboo, you have to have high pressure. So people normally wouldn't say "high pressure laminated bamboo."· They would say "laminated bamboo."· But if one said "high pressure laminated bamboo," anyone in the industry would know what they were talking about.
>
> Q. So do you recall ever seeing the term "high pressure laminated bamboo"?
>
> A. You're asking me to recall a specific reference to that specific word over a 35-year career.· I would almost guarantee you for sure I have, but I cannot recall the specifics around when I saw that exact term being used. Again, I want to emphasize, "laminated bamboo," very common, and you can only laminate bamboo with high pressure.

Ex. 9, Transcript of Deposition of Kent Wheiler (Wheiler Dep. Tr.) at 32:3-14.

> Q. Okay.· Understood. The next sentence -- actually, I'm going to go to the next paragraph. It starts with the term -- the sentence: Laminated bamboo is a common material used for furniture. And my question here is, how come you didn't put here "high pressure laminated bamboo"? Is there a difference between high pressure laminated bamboo as used in the exclusion as laminated bamboo?

A. No.· As I explained in the previous paragraph, to laminate bamboo, you have to use high pressure.

Q. Do you know why the words “high pressure” is added to the exclusion?

A. “High pressure” is unnecessary or redundant.· If -- you know, you have to have high pressure to laminate the bamboo.

Q. So let me make sure I understand.· I think I do, but let me just make sure. The term “high pressure laminated bamboo,” your position is that the words "high pressure" are redundant?

A. Yeah.· My position – “redundant” may not be the proper word, but my position is that if you know about laminated bamboo, you know that it has to be laminated under high pressure.· So people in the industry typically wouldn't say "high pressure laminated bamboo”; they would just say “laminated bamboo.”

Ex. 9, Wheiler Dep. Tr. at 35:10-36-15.

Dr. Wheiler’s own testimony does not interpret the actual language of the exclusion because he considers the term “high pressure” “redundant” and “unnecessary.” Moreover, Dr. Wheiler’s testimony severely undercuts Greenington’s manufacture-based interpretation of the subject exclusion. Dr. Wheiler testified that high pressure is the only method of making “laminated bamboo.” If that is true, then “high pressure” is inherent in the very act of making laminated bamboo. As Dr. Wheiler testified, the exclusion could have simply stated “laminated bamboo.” But it does not. Under Greenington’s own interpretation, then, the term “high pressure” in the exclusion is surplusage.

Moreover, Dr. Wheiler’s testimony undercuts the opinions of Dr. Changhua Fang and Dr. William Eggington. If, as Dr. Wheiler explains, all laminated bamboo is made under high pressure, then neither Dr. Fang nor Dr. Eggington explained what “high pressure” means within the exclusion. Because Greenington’s experts’ testimony and reports are not supported by the

actual language of the exclusion, unsupported by general and scientific dictionaries, and contradictory, they should be given no weight.

## CONCLUSION

For these reasons and those in our moving brief, we respectfully request that the Court grant the Government's cross-motion for summary judgment and deny plaintiff's motion for summary judgment.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

Justin R. Miller
JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

By: /s/ Marcella Powell
MARCELLA POWELL
Senior Trial Counsel
Civil Division, U.S. Dept. of Justice
Commercial Litigation Branch
26 Federal Plaza, Room 346
New York, New York 10278
Tel. (212) 264-9230
Attorneys for Defendant

Of Counsel:
Michael Anderson
Office of the Assistant Chief Counsel
International Trade Litigation
U.S. Customs and Border Protection

Dated: September 18, 2026

**CERTIFICATE OF COMPLIANCE**

The brief complies with the 14,000 word limitation imposed by Chambers Procedures.

The word count is 4,549.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

Justin R. Miller
JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

By: /s/ Marcella Powell
MARCELLA POWELL
Senior Trial Counsel
Department of Justice, Civil Division
Commercial Litigation Branch
26 Federal Plaza – Suite 346
New York, New York 10278
(212) 264-1873
Attorneys for Defendant

DATED: September 18, 2026